# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:19-CR-53** |
| | : | |
| v. | : | **(Chief Judge Conner)** |
| | : | |
| **GTBK MARKETING,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

The government and defendant GTBK Marketing ("GTBK") have entered into a deferred prosecution agreement ("DPA"). In that agreement, GTBK agrees to waive indictment, consents to the filing of a single-count criminal information, and accepts responsibility for improper conduct. In exchange, the government promises to defer prosecution on the information for three years conditioned on GTBK's law-abiding behavior during that period. The agreement intends to suspend the Speedy Trial Act clock during the deferral period, bringing the DPA before the court for approval.

I.  **Factual Background & Procedural History**

In 2016, a grand jury returned an indictment against Dennis Tubbergen ("Tubbergen") and Christopher Ostrowski ("Ostrowski") charging, *inter alia*, conspiracy and multiple counts of wire fraud. United States v. Tubbergen, No. 1:16-CR-213, Doc. 1 (M.D. Pa. Aug. 3, 2016). According to the indictment, Tubbergen and Ostrowski—through GTBK—orchestrated a marketing scheme involving the sale of a "patent-pending" financial system known as the Immediate Legacy Program (the "Program"). Id. ¶ 2. The Program purportedly allowed wealthy individuals to make

immediate charitable contributions without incurring costs or taxes by utilizing a system that involved development of a limited liability company and purchase of annuities and life insurance policies.  Id.  The Program claimed that "at the death of the donor, the full amount of the annuity used to pay the donor and fund the charitable donation would be paid back to the person's estate by the life insurance policy."  Id.

Tubbergen, as CEO of GTBK, marketed the Program extensively to financial planners and insurance agents across the country.  Id. ¶ 3.  Ostrowski, a GTBK sales representative, likewise traveled the country putting on live presentations and pitching the Program to potential investors.  Id. ¶ 4.  The indictment alleges that Tubbergen and Ostrowski made multiple false and fraudulent representations to encourage potential investors to purchase the Program and its various products.  Id. ¶ 5.  For example, Tubbergen and Ostrowski purportedly told the victims that well-known charities and nonprofit organizations including Children's Memorial Hospital of Chicago, the Grid Iron Greats Assistance Fund, Harvard University, and Johns Hopkins University were successfully using the Program, which was not true.  Id. ¶¶ 8, 12.  Potential investors were also allegedly told that GTBK had preexisting relationships with numerous charities and nonprofits that were waiting to be contacted about the Program; this too was materially false.  Id. ¶¶ 9, 10.  Those who signed up for the Program paid GTBK, on average, between $35,000 and $50,000.  Id. ¶ 10.

Tubbergen and Ostrowski pled not guilty to the charges.  Tubbergen, No. 1:16-CR-213, at Docs. 19, 20.  Over the following two and a half years, trial was

repeatedly continued at the parties' request.  See id. at Docs. 34, 35, 41-44, 46-51, 53-56, 59-60, 63, 67-68, 72-73.  In late January 2019, the government filed a one-count information charging GTBK with mail fraud and included the instant DPA, which had been executed one week prior.  United States v. GTBK Mktg., 1:19-CR-53, Docs. 1, 3 (M.D. Pa. Jan. 31, 2019).

The salient terms of the DPA are as follows.  GTBK agrees to waive indictment; the United States Attorney's Office will file a single-count information charging GTBK with mail fraud; GTBK accepts responsibility for the fraudulent conduct as described in the preamble of the DPA, which largely mirrors the allegations in the Tubbergen and Ostrowski indictment; GTBK will pay the total sum of $300,000 over a three-year deferral period, which funds are to provide restitution to the fraud victims; GTBK will not commit any crimes or violate any regulations during the deferral period; and after the three-year deferral period has expired, if GTBK has satisfied its obligations under the DPA, the United States will move to dismiss the information with prejudice.  Id. at Doc. 3 ¶¶ 7-13.  Although not explicitly stated in the DPA, the agreement also contemplates dismissal of the criminal charges pending against Tubbergen and Ostrowski.  See Tubbergen, 1:16-CR-213, at Doc. 72 ¶ 2.

## II. Discussion

The only issue before the court is whether to approve the DPA in the limited context of excluding time under the Speedy Trial Act, 18 U.S.C. § 3161, in prosecuting the information against GTBK.  Section 3161(h)(2) excludes from the speedy trial clock "[a]ny period of delay during which prosecution is deferred by the

3

attorney for the Government pursuant to written agreement with the defendant, *with the approval of the court*, for the purpose of allowing the defendant to demonstrate his good conduct." 18 U.S.C. § 3161(h)(2) (emphasis added). Circuit courts considering this provision and its legislative history agree that the district court's review of DPAs generally is confined to determining—before granting a speedy trial waiver—whether the agreement is made in good faith for the purposes of the Act, *viz.*, "allowing the defendant to demonstrate his good conduct." United States v. Fokker Servs. B.V., 818 F.3d 733, 740-41, 744-45 (D.C. Cir. 2016); United States v. HSBC Bank USA, N.A., 863 F.3d 125, 137-38 (2d Cir. 2017). Any further evaluation of the substantive merits of the DPA or supervision of the DPA's out-of-court implementation risks infringing on "the Executive's constitutionally rooted primacy over criminal charging decisions." Fokker Servs., 818 F.3d at 742. Accordingly, the court's focus is assuring that "the DPA in fact is geared to enabling the defendant to demonstrate compliance with the law, and is not instead a pretext intended merely to evade the Speedy Trial Act's time constraints." Id. at 744.

Courts also have inherent supervisory authority to reject a DPA if it contains illegal or unethical provisions. See id. at 747. Examples of illegality or impropriety that could warrant disapproval of a DPA include constitutional violations or egregious prosecutorial misconduct. See HSBC Bank, 863 F.3d at 136-37; Fokker Servs., 818 F.3d at 747. This extraordinary authority, however, should be exercised sparingly. HSBC Bank, 863 F.3d at 136. Absent clear evidence to the contrary, DPAs carry "the presumption of regularity that federal courts are obliged to ascribe to prosecutorial conduct and decisionmaking." Id.

4

We have received and considered briefing from the parties as well as numerous victim impact statements. We also held a hearing at which time we heard directly from seven victims as well as from the parties to the DPA and counsel for Tubbergen and Ostrowski. We make the following observations.

There can be no doubt that the victims of this alleged fraud scheme are deeply dissatisfied and frustrated with the deferred prosecution agreement, a sentiment that was nearly uniform across the many impact letters and in-court statements. As one victim wryly remarked during the hearing, the fraud was the injury, but "the DPA was the insult." We further note the victims' unanimity of disbelief that the $300,000 restitution amount is adequate or fair. The victims repeatedly averred that this figure does not cover the actual reported losses and pales in comparison to the amount GTBK earned through its sale of the Program.[1] Many victims explained that, beyond the $35,000 to $50,000 they each paid to GTBK, they lost countless hours attempting to learn and sell a flawed system that was marketed to them through misrepresentation or outright dishonesty. We can safely say that, at least as to victims who responded to the government's inquiry, the prevailing opinion was one of outrage that Tubbergen and Ostrowski would potentially avoid criminal prosecution while GTBK—a corporation—receives a relatively small fine and deferred prosecution on a single-count information.

---

[1] As the United States explained during the hearing, an agent for GTBK had previously informed Michigan's Attorney General that the Program generated approximately $14 million in gross revenue.

Our task, however, is not to weigh in on the merits of the DPA or the government's charging or dismissal decisions. The separation of powers enshrined in our Constitution places those determinations squarely in the province of the Executive. See U.S. CONST. art. II, §§ 2-3. Our role is confined to ensuring that the DPA (1) is not pretext intended to circumvent the time constraints of the Speedy Trial Act and (2) does not contain illegal or unethical provisions.

We find no evidence or intimation that the DPA is not a good-faith agreement meant to allow "the defendant to demonstrate [its] good conduct" and compliance with the law. 18 U.S.C. § 3161(h)(2); Fokker Servs., 818 F.3d at 745. The DPA notes that GTBK has permanently ceased sale of the Program and promises that it will not violate any law or regulation going forward. The three-year deferral period, which includes oversight by the government, will also require installment payments on the $300,000 restitution amount.[2] Nothing in the DPA implies that its purpose is anything other than that which was contemplated by Congress when it drafted Section 3161(h)(2).

We likewise find no evidence of illegality or ethical impropriety. Our own scrutiny of the DPA reveals no such issues. At the hearing, we thoroughly explored whether the DPA was negotiated at arms-length, which all parties confirmed. The parties further substantiated that no conflicts of interest or other ethical quandaries

---

[2] We note that the DPA lacks clarity as to how restitution funds will be distributed "to individuals identified by the United States," GTBK Marketing, 1:19-CR-53, Doc. 3 ¶ 11, which may create administrative problems for the government during the deferral period. We assume that the government will endeavor to reduce to writing its method of distribution to ensure equitable treatment of victim claimants.

impacted the negotiations or written agreement. Counsel for Tubbergen and Ostrowski, moreover, submitted extensive briefing and documentary support regarding exculpatory evidence that they had willingly disclosed to the government after indictment. In sum, we are convinced that the DPA does not implicate any of the precious few defects that would permit this court to reject it.

## IV. Conclusion

We do not discount the deeply held concerns of the victims, many of whom have gone to great lengths to articulate their opinions to the government and the court. We note, with particular disquietude, the many victims who expressed that the DPA and likely dismissal of charges against Tubbergen and Ostrowski had shaken their faith in the fundamental tenets of our system of justice. But the court's role is not to agree or disagree with the Executive's discretionary prosecutorial decisions. Having satisfied ourselves that the DPA is not pretextual, illegal, or unethical, we are constrained to approve it and suspend the Speedy Trial Act clock for the deferral period pursuant to 18 U.S.C. § 3161(h)(2). An appropriate order shall issue.

          /S/ CHRISTOPHER C. CONNER
          Christopher C. Conner, Chief Judge
          United States District Court
          Middle District of Pennsylvania

Dated: May 8, 2019