# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:19-CR-53** |
| | : | |
| v. | : | (Chief Judge Conner) |
| | : | |
| **GTBK MARKETING,** | : | |
| | : | |
| **Defendant** | : | |

## **MEMORANDUM**

The government and defendant GTBK Marketing ("GTBK") have entered into a deferred prosecution agreement ("DPA"). In that agreement, GTBK agrees to waive indictment, consents to the filing of a single-count criminal information, and accepts responsibility for improper conduct. In exchange, the government promises to defer prosecution on the information for three years, conditioned on GTBK's law-abiding behavior during that period. We previously approved the DPA for the limited purpose of suspending the Speedy Trial Act clock during the deferral period. New information compels the court to reverse course and deny tolling the speedy trial clock for such purposes going forward.

I.     **Factual Background & Procedural History**

In 2016, a grand jury returned an indictment against Dennis Tubbergen ("Tubbergen") and Christopher Ostrowski ("Ostrowski") charging, *inter alia*, conspiracy and multiple counts of wire fraud. United States v. Tubbergen, No. 1:16-CR-213, Doc. 1 (M.D. Pa. Aug. 3, 2016). According to the indictment, Tubbergen and Ostrowski—through GTBK—orchestrated a marketing scheme involving the sale of a "patent-pending" financial system known as the Immediate Legacy Program (the

"Program"). Id. ¶ 2. The Program purportedly allowed wealthy individuals to make immediate charitable contributions without incurring costs or taxes by utilizing a system that involved development of a limited liability company and purchase of annuities and life insurance policies. Id. The Program claimed that "at the death of the donor, the full amount of the annuity used to pay the donor and fund the charitable donation would be paid back to the person's estate by the life insurance policy." Id.

Tubbergen, as CEO of GTBK, marketed the Program extensively to financial planners and insurance agents across the country. Id. ¶ 3. Ostrowski, a GTBK sales representative, likewise traveled the nation putting on live presentations and pitching the Program to potential investors. Id. ¶ 4. The indictment alleges that Tubbergen and Ostrowski made multiple false and fraudulent representations to encourage potential investors to purchase the Program and its various products. Id. ¶ 5. For example, Tubbergen and Ostrowski purportedly told victims that well-known charities and nonprofit organizations, including Children's Memorial Hospital of Chicago, the Grid Iron Greats Assistance Fund, Harvard University, and Johns Hopkins University, were successfully using the Program, which was not true. Id. ¶¶ 8, 12. Potential investors were also allegedly told that GTBK had preexisting relationships with numerous charities and nonprofits that were waiting to be contacted about the Program; this too was materially false. Id. ¶¶ 9, 10. Those who signed up for the Program paid GTBK, on average, between $35,000 and $50,000. Id. ¶ 10.

Tubbergen and Ostrowski pled not guilty to the charges. Tubbergen, No. 1:16-CR-213, at Docs. 19, 20. Over the following two and a half years, trial was repeatedly continued at the parties' request. See id. at Docs. 34, 35, 41-44, 46-51, 53-56, 59-60, 63, 67-68, 72-73. In late January 2019, the government filed a one-count information charging GTBK with mail fraud and included the instant DPA, which had been executed one week prior. United States v. GTBK Mktg., 1:19-CR-53, Docs. 1, 3 (M.D. Pa. Jan. 31, 2019).

The salient terms of the DPA are as follows. GTBK agrees to waive indictment; the United States Attorney's Office will file a single-count information charging GTBK with mail fraud; GTBK accepts responsibility for the fraudulent conduct as described in the preamble of the DPA, which largely mirrors the allegations in the Tubbergen and Ostrowski indictment; GTBK will pay the total sum of $300,000 over a three-year deferral period, which funds are to provide restitution to the fraud victims; GTBK will not commit any crimes or violate any regulations during the deferral period; and after the three-year deferral period has expired, if GTBK has satisfied its obligations under the DPA, the United States will move to dismiss the information with prejudice. Id. at Doc. 3 ¶¶ 7-13. Although not explicitly stated in the DPA, the agreement also contemplates dismissal of the criminal charges pending against Tubbergen and Ostrowski. See Tubbergen, 1:16-CR-213, at Doc. 72 ¶ 2.

The court held a hearing during which we provided the parties and victims an opportunity to present their respective positions on the DPA. Thereafter, we approved the DPA in the limited context of excluding time under the Speedy Trial

3

Act, 18 U.S.C. § 3161, in prosecuting the information against GTBK. See United States v. GTBK Mktg., No. 1:19-CR-53, 2019 WL 2023581, at *2-3 (M.D. Pa. May 8, 2019). Specifically, we found that there was "no evidence or intimation that the DPA is not a good-faith agreement meant to allow 'the defendant to demonstrate [its] good conduct' and compliance with the law," and were thus "convinced that the DPA does not implicate any of the precious few defects that would permit this court to reject it." Id. at *3 (alteration in original) (quoting 18 U.S.C. § 3161(h)(2)) (citing United States v. Fokker Servs. B.V., 818 F.3d 733, 745 (D.C. Cir. 2016)). After careful consideration of new information, we now reach the opposite conclusion.

## II. Discussion

Once again, the only issue before the court is approval of the DPA in the limited context of excluding time under the Speedy Trial Act. Section 3161(h)(2) excludes from the speedy trial clock "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, *with the approval of the court*, for the purpose of *allowing the defendant to demonstrate his good conduct*." 18 U.S.C. § 3161(h)(2) (emphasis added). Circuit courts considering this provision and its legislative history agree that the district court's review of DPAs generally is confined to determining—before granting a speedy trial waiver—whether the agreement is made in good faith for the purposes of the Act, *viz.*, "allowing the defendant to demonstrate his good conduct." See Fokker Servs., 818 F.3d at 740-41, 744-45; United States v. HSBC Bank USA, N.A., 863 F.3d 125, 137-38 (2d Cir. 2017); 18 U.S.C. § 3161(h)(2). The proper focus is to ensure that the DPA "is *bona fide* before

4

granting a speedy trial waiver," HSBC Bank, 863 F.3d at 138; that is, assuring "that the DPA in fact is geared to enabling the defendant to demonstrate compliance with the law," Fokker Servs., 818 F.3d at 744. Any further evaluation of the substantive merits of the DPA or supervision of the DPA's out-of-court implementation risks infringing on "the Executive's constitutionally rooted primacy over criminal charging decisions." Id. at 742.

Courts also possess inherent supervisory authority to reject a DPA if it contains illegal or unethical provisions. See id. at 747. Examples of illegality or impropriety that could warrant disapproval of a DPA include constitutional violations or egregious prosecutorial misconduct. See HSBC Bank, 863 F.3d at 136-37; Fokker Servs., 818 F.3d at 747. This extraordinary authority, however, should be exercised sparingly. HSBC Bank, 863 F.3d at 136. Absent clear evidence to the contrary, DPAs carry "the presumption of regularity that federal courts are obliged to ascribe to prosecutorial conduct and decisionmaking." Id.

After we issued our decision approving the DPA for Speedy Trial Act purposes, new information came to light regarding GTBK. The court was directed to a 2016 interview for MLive.com, wherein Tubbergen is quoted as saying that GTBK "closed in 2011" and since that time he has been working for PLP Advisors, LLC ("PLP Advisors"), which "has no relationship" to GTBK.[1] Tubbergen also informed the Financial Industry Regulatory Authority that "GTBK Marketing . . .

---

[1] See John Agar, *Financial 'expert,' TV and radio personality denies $2M fraud*, MLIVE.COM (Aug. 10, 2016), https://www.mlive.com/news/grand-rapids/ 2016/08/financial_expert_tv_and_radio.html.

5

closed in 2011" and that it "had no relationship with PLP Advisors LLC . . . or its clients."[2] Filings with the Michigan Department of Licensing and Regulatory Affairs ("LARA") further confirm that GTBK ceased operations around 2011. Annual limited liability company statements for GTBK stopped being filed after 2010.[3] Then, on a single day in July 2018, Tubbergen filed the annual statements for years 2011 through 2018.[4] He also filed a "certificate of restoration of good standing" on the same day.[5] This evidence suggests that GTBK closed in 2011 and was revived in 2018 around the time that the DPA was being negotiated.

We find that this new information, which was previously unknown and undisclosed to this court, is material to our decision of whether to approve the DPA for Speedy Trial Act purposes. Section 3161(h)(2) explicitly provides that the purpose of excusing delay for deferred prosecution agreements is to "allow[] the defendant to demonstrate [its] good conduct." 18 U.S.C. § 3161(h)(2). Those agreements, after all, are intended to encourage defendants to modify their past misconduct and behave better going forward. See HSBC Bank, 863 F.3d at 142-43

---

[2] See *Investment Adviser Representative Public Disclosure Report, Dennis Clare Tubbergen, CRD #2505625*, SECURITIES & EXCH. COMM'N 11, https://www.adviserinfo.sec.gov/IAPD/Support/ReportViewer.aspx?indvl_pk =2505625 (last visited July 15, 2019).

[3] See LARA Corporations Online Filing System, Department of Licensing and Regulatory Affairs, MICHIGAN.GOV, https://cofs.lara.state.mi.us/corpweb/ CorpSearch/CorpSearch.aspx (search in "Search by entity name" search bar for "GTBK Marketing, L.L.C." then view "ALL FILINGS") (last visited July 15, 2019).

[4] See id.

[5] See id.

6

(Pooler, J., concurring) (explaining and quoting legislative history to Section 3161(h)(2)). However, if a corporate defendant will have no future conduct—good or bad—because it has ceased operations and is not truly a going concern, the DPA would be meaningless because there will be no "behavior" for the government to monitor.[6]

We raised these concerns with the parties and invited them to respond. GTBK essentially admits that it closed in 2011 and has been operationally dormant since that time. (See Doc. 13 at 1-2, 4). GTBK cites bad publicity from the victims' "disparagement campaign," Obama-era proposed regulations, and indictment of its former CEO, Tubbergen, as reasons for its inactivity. (Id. at 2-3). The company contends that Tubbergen has "always" planned to "reinvigorate GTBK and forge ahead with a new business model upon the resolution of the criminal case" pending against him. (Id. at 4). GTBK asserts that "the same corporate entity with the same ownership and operators . . . will continue on in existence and operate its business as a DBA known as 'Advocacy Practice Systems.'"[7] (Id. at 5). The government, for its part, relies entirely on the explanation provided by GTBK, but admits that if it

---

[6] In the case *sub judice*, for example, the DPA specifically states that GTBK "agrees to demonstrate its future good conduct by complying with all laws and regulations." (Doc. 3 ¶ 8).

[7] A limited liability company with this name appears to have been created by Tubbergen on April 15, 2019, over two months after the DPA was filed and just two weeks before GTBK submitted its first memorandum in support of the DPA. See LARA Corporations Online Filing System, Department of Licensing and Regulatory Affairs, MICHIGAN.GOV, https://cofs.lara.state.mi.us/corpweb/CorpSearch/CorpSearch.aspx (search in "Search by entity name" search bar for "Advocacy Practice Systems" then view "ALL FILINGS") (last visited July 15, 2019).

turns out that GTBK is not "an ongoing business concern" but merely "a conduit for restitution to be paid, then there would be a serious concern whether GTBK was in full compliance with the DPA." (Doc. 11 at 6).

The parties' responses do not assuage our serious misgivings *vis à vis* the instant DPA. The objective facts demonstrate that GTBK closed in 2011 and has been essentially inactive since that time. In the face of federal prosecution, Tubbergen, GTBK's former CEO, appears to have resurrected this defunct business on paper with plans to operate it under the name Advocacy Practice Systems—a company he created four months *after* the parties executed the DPA. The undated, unsigned business plan appended to GTBK's briefing requires, *inter alia*, that customers of Advocacy Practice Systems "have a relationship" with and pay management fees to PLP Advisors, another company at least partly owned and operated by Tubbergen.[8] Tubbergen, however, has previously disavowed any connection between GTBK and PLP Advisors.[9] In view of these facts, we strongly disagree with GTBK's assertion that "[t]his scenario is entirely consistent with any other DPA entered into by a business entity, or its successor entity, with the United

---

[8] (See Doc. 13, Ex. A at 5, 9); LARA Corporations Online Filing System, Department of Licensing and Regulatory Affairs, MICHIGAN.GOV, https://cofs.lara.state.mi.us/corpweb/CorpSearch/CorpSearch.aspx (search in "Search by entity name" search bar for "PLP Advisors, LLC" then view "ALL FILINGS") (last visited July 15, 2019).

[9] See *supra* John Agar, *Financial 'expert,' TV and radio personality denies $2M fraud*, MLIVE.COM (Aug. 10, 2016); *Investment Adviser Representative Public Disclosure Report, Dennis Clare Tubbergen*, CRD #2505625.

8

States of America[.]" (Doc. 13 at 4). To the contrary, the present scenario is markedly *different* than any other DPA this court has entertained or researched.

We are unconvinced that the instant DPA satisfies the singular purpose of Section 3161(h)(2) of the Speedy Trial Act. We cannot, in good conscience, toll the speedy trial clock for the prosecution of a business entity that ceased operations nearly a decade ago and which will allegedly be operated, going forward, under a different name in affiliation with other businesses owned by Tubbergen but purportedly unconnected to GTBK. Such facts belie a conclusion that the DPA is "*bona fide*" and "genuinely intended" to allow *GTBK Marketing*—not Tubbergen or some other business entity—to demonstrate its good conduct. See HSBC Bank, 863 F.3d at 138. Rubber-stamping the DPA and sanctioning its resultant prosecutorial delay is anathema to the letter and spirit of Section 3161(h)(2). Consequently, the court revokes its prior approval, a step we believe is not only permitted but demanded under the present circumstances. See HSBC Bank, 863 F.3d at 138-39, 142.

## III. Conclusion

We do not speak to the prosecutorial decisions in this matter and the related criminal case involving Tubbergen and Ostrowski. We likewise do not comment on the content, merits, or out-of-court supervision of the DPA. Those issues are not in this court's bailiwick; they firmly reside with the Executive Branch. The United States may, in its considerable discretion, proceed with prosecution of these cases or decide to dismiss some or all of the pending charges. We do not foray into such

matters. Our opinion today concerns only the limited issue of suspension of the Speedy Trial Act clock for the deferral period pursuant to 18 U.S.C. § 3161(h)(2). For the foregoing reasons, we will revoke our prior approval of the DPA under Section 3161(h)(2). An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: July 17, 2019